IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KERRIE V., | 8:20CV374 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

This is an action under 42 U.S.C. § 405(g) for judicial review of the Social Security Commissioner's final decision denying Plaintiff's application for disability insurance benefits.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

# I. BACKGROUND

## A. Procedural History

Plaintiff protectively filed her application for disability insurance benefits on August 28, 2017, claiming a disability onset date of April 1, 2016. After her claim was denied initially and upon reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on August 9, 2019. Plaintiff testified at the hearing and was represented by counsel. A vocational expert also testified. The ALJ issued an unfavorable decision on October 7, 2019, ultimately concluding that although Plaintiff had severe physical and mental impairments, she was not disabled from the alleged onset date though the date of the decision because there were a significant number of jobs in the national economy she could perform.

---

[1] In accordance with General Order No. 2015-15 (Filing 4), the matter is submitted to the court on cross-motions (Filings 20, 22), based on review of the parties' briefs (Filings 21, 23, 28) and the administrative record (Filings 14-16).

On July 17, 2020, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. This action was timely filed on September 18, 2020.

## B. The ALJ's Decision

In evaluating Plaintiff's claim, the ALJ followed the sequential evaluation process. *See* 20 C.F.R. § 404.1520(a).[2] At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. At step two, the ALJ found Plaintiff had several impairments that significantly limit the ability to perform basic work activities: Ehlers-Danlos syndrome,[3] fibromyalgia,[4] major depressive disorder, posttraumatic stress disorder, and anxiety disorder. At step three, the ALJ found these severe impairments, whether considered singly or in combination, did not meet or equal the Listings of Impairments. The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), finding she had the following limitations:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: she cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps and

---

[2] The five steps are: "(1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ('Appendix'); (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." *Id.* (citations omitted).

[3] Ehlers-Danlos syndrome is a group of inherited disorders that affect connective tissues. *Acacia C. v. Saul*, No. 8:20-CV-96, 2021 WL 1516451, at *4 n. 3 (D. Neb. Apr. 16, 2021) (citing www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125).

[4] Fibromyalgia, a chronic condition recognized by the American College of Rheumatology (ACR), is inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue. *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n. 1 (8th Cir. 2003).

stairs, balance, kneel, stoop, crouch, and crawl; she can occasionally reach overhead with the bilateral upper extremity; she cannot tolerate concentrated exposure to temperature extremes, vibration, loud noises, dusts, fumes, odors, chemicals, or hazards like unprotected heights; she can have no more than occasional contact with the public and coworkers; and she can tolerate no more than occasional changes in the work setting.

(Tr. 15-20, Filing 16-2 at 16-21.) Considering Plaintiff's age (younger individual), education (high school), work experience, and RFC, the ALJ found Plaintiff was not under a disability because she could perform unskilled jobs at the light physical demand level which exist in significant numbers in the national economy, such as inserting machine operator,[5] electrical equipment subassembler,[6] and marker.[7]

---

[5] *See* Dictionary of Occupational Titles (DOT) 208.685-018 INSERTING-MACHINE OPERATOR (clerical):

Tends machine that inserts printed matter, such as letters or booklets into folders or envelopes: Stacks quantities of inserts and covers into machine feedboxes and turns setscrews to adjust feeder mechanisms, according to thickness of material. Starts machine and replenishes feedboxes with inserts and covers.

Available online at U.S. Department of Labor, Office of Administrative Law Judges, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT02A.

[6] *See* DOT 729.684-054 SUBASSEMBLER (elec. equip.):

Performs any of following tasks to assemble electrical equipment and parts, such as armature cores, coils, electric motors, and switches: Tapes lead wires to coils to facilitate soldering. Solders coil and lead wires, using soldering iron. Trims leads and positions parts in specified relationship to each other, using hands and handtools. Bolts, screws, clips, cements, and fastens parts together, using hands, handtools, or portable powered tools. May remove burrs from parts prior to assembly, using file or electric grinder.

Available online at U.S. Department of Labor, Office of Administrative Law Judges, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT07C.

[7] *See* DOT 209.587-034 MARKER (retail trade; wholesale tr.) alternate titles: marking clerk; merchandise marker; price marker; ticket maker**:**

3

## C. Issues Presented for Review

Plaintiff requests that the Commissioner's decision be reversed and the case remanded for further proceedings because the ALJ allegedly erred by (1) making a finding without sufficient medical support that Plaintiff had the ability to perform occasional overhead reaching, (2) not developing the record concerning Plaintiff's physical limitations, (3) not providing a sufficient explanation for dismissing the opinions of Plaintiff's psychiatric medication manager, Anne Hofer, APRN, and (4) not providing sufficient reasons for discounting Plaintiff's subjective complaints. (Filing 21 at 2.)

## D. Medical Treatment Records

<u>Primary Care Physicians</u>

<u>2016</u>

On March 29, 2016, Plaintiff saw Amber Beckenhauer, D.O., as a new patient for primary care at MCH & Health System. Plaintiff reported ongoing fatigue, chronic left hip pain, occasional headaches, depression, and other symptoms. Plaintiff stated she does a lot of farming and is very active. No shoulder pain was reported. (Ex. 5F: Tr. 345, Filing 16-7 at 51.) Dr. Beckenhauer planned an orthopedic consultation for her chronic left hip pain and back discomfort. (Ex. 5F: Tr. 350, Filing 16-7 at 56.)

---

Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. ay record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. ay print information on tickets, using ticket-printing machine [TICKETER (any industry); TICKET PRINTER AND TAGGER (garment)].

Available online at U.S. Department of Labor, Office of Administrative Law Judges, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT02A.

On April 5, 2016, Plaintiff reported her continued hip and low back pain prevented her from performing her massage therapy work. Plaintiff also thought she may have PTSD. (Ex. 5F: Tr. 352, Filing 16-7 at 58.) Dr. Beckenhauer ordered x-rays before Plaintiff's orthopedic consultation with Casey Beran, M.D. (Ex. 6F: Tr. 435, Filing 16-7 at 141.)

On May 5, 2016, Plaintiff reported she had a few episodes where she had to lift her left leg to move it because her hip hurt so bad. She reported continued PTSD problems. (Ex. 5F: Tr. 356, Filing 16-7 at 62.) Dr. Beckenhauer adjusted the PTSD medications by decreasing Serzone and adding sertraline. Dr. Beckenhauer planned to contact Dr. Beran concerning a left hip injection. (Ex. 5F: Tr. 359-660, Filing 16-7 at 65-66.)

On May 26, 2016, Plaintiff reported continued left hip pain with some improvement after the injection, but she was still having difficulty abducting her left leg. (Ex. 5F: Tr. 362, Filing 16-7 at 68.) Dr. Beckenhauer noted Plaintiff was "limited on her ADLs and her quality of life" due to her left hip pain and planned for a second opinion as far as a left hip surgery. (Ex. 5F: Tr. 365, Filing 16-7 at 71.)

On July 15, 2016, Plaintiff reported improvement in her left hip pain. Dr. Beckenhauer adjusted Plaintiff's PTSD medications. (Ex. 5F: Tr. 367-68, Filing 16-7 at 73-74.)

<u>2017</u>

On February 10, 2017, Plaintiff returned to Dr. Beckenhauer for primary care and an annual exam, reporting no left hip pain. Plaintiff was having problems with nightmares and difficulty sleeping and difficulty with side effects with her PTSD medications. (Ex. 5F: Tr. 370, Filing 16-7 at 76.) Dr. Beckenhauer refilled psychiatric medications. (Ex. 5F: Tr. 374, Filing 16-7 at 80.)

On April 21, 2017, Plaintiff reported having severe pain and freezing in her right shoulder, among other complaints. (Ex. 5F: Tr. 376, Filing 16-7 at 82.)

On May 17, 2017, Dr. Beckenhauer noted that insurance had not approved Ehlers-Danlos testing. Plaintiff reported her left shoulder was pain free but dislocating without any effort; her right shoulder was painful and dislocating as well. Plaintiff reported she had to reset her right elbow up to 15 times per day. She was seeing a chiropractor once a week to help with her hip and scoliosis pain. Plaintiff

explained it was her bones and joints that hurt. (Ex 5F: Tr. 382-3, Filing 16-7 at 88-89.) Dr. Beckenhauer noted that on exam Plaintiff had "dislocations to the left and right shoulders, passively. Pain at the right shoulder." (Ex. 5F: Tr. 385, Filing 16-7 at 91.)

On June 29, 2017, Plaintiff reported having difficulty with her PTSD and depression and wanted to start Serzone again. (Ex. 34F: Tr. 1340, Filing 15-3, at 135.) Dr. Beckenhauer restarted Serzone. (Ex. 34F: Tr. 1343, Filing 15-3 at 138.)

On July 13, 2017, Plaintiff returned to Dr. Beckenhauer after having been approved for Ehlers-Danlos Syndrome testing. Plaintiff was having pain in her neck, low back, and both shoulders. (Ex. 34F: Tr. 1345, Filing 15-3 at 140.) Dr. Beckenhauer ordered x-rays of both shoulders, her cervical spine, and her lumbar spine. (Ex. 34F: Tr. 416-19, Filing 16-7 at 22-25.) The labs were negative for confirming Ehlers-Danlos Syndrome. (Ex. 34F: Tr. 411, Filing 16-7 at 117.)

On August 29, 2017, Plaintiff reported lots of triggers for her depression and PTSD and that she had been unable to take trazodone and gabapentin. (Ex. 5F: Tr. 395, Filing 16-7 at 101.) Dr. Beckenhauer restarted Serzone. (Ex. 5F: Tr. 398, Filing 16-7 at 104.)

<u>2018</u>

On January 30, 2018, Plaintiff saw Joan Quinn, M.D., for primary care at Methodist Health System. Her musculoskeletal examination was normal with a normal gait. Dr. Quinn noted Plaintiff seemed to be "fairly noncompliant" with rheumatology's recommendations including muscle relaxers and physical therapy. (Ex. 12F: Tr. 483, Filing 14-1 at 25.) Most of this appointment was coordinating care and counseling, with completion of releases to allow Dr. Quinn to obtain records. (Ex. 12F: Tr. 486, Filing 14-1 at 28.)

On March 19, 2018, Plaintiff saw Dr. Quinn and reported, among other things, that she thought her cognitive functioning was lacking. (Ex. 12F: Tr. 479, Filing 14-1 at 21.) On exam, Plaintiff displayed normal gait and normal strength in the musculoskeletal system, but Dr. Quinn noted: "B[oth] shoulders easily dislocate. Her right shoulder has limited ROM and she cannot lift it above her head." Dr. Quinn increased the Serzone dosage to better control depression and ordered an orthopedics consultation for her shoulders. (Ex 12F: Tr. 481-82, Filing 14-1 at 23-24.)

On May 7, 2018, Plaintiff saw Dr. Quinn following her recent right shoulder MRI which had shown severe supraspinatus tendinosis with imbition of contrast that was consistent with an interstitial tear, a SLAP tear, and other findings. (Ex. 31F: Tr. 1207, Filing 15-3 at 2.) Plaintiff reported she was doing better and had not had any recent falls. Plaintiff displayed a normal gait. Dr. Quinn directed Plaintiff to follow up with her orthopedist, Darren Keiser, M.D. (Ex. 31F: Tr. 1210, Filing 15-3 at 5.)

On May 29, 2018, Plaintiff's physical examination at Methodist Health System by John R. Lohrberg, M.D., revealed normal gait, no swelling in the musculoskeletal system, and no joint deformity. (Ex. 31F: Tr. 1277, Filing 15-3 at 72.)

On July 2, 2018, Plaintiff again saw Dr. Quinn. Plaintiff explained she was undergoing physical therapy for her right shoulder and reported her pain medications were not working and her muscle relaxers were not helping either. (Ex. 31F: Tr.1243, Filing 15-3 at 38.)

2019

On January 31, 2019, Plaintiff saw Samuel Dubrow, M.D., at CHI Health concerning her left shoulder pain. Plaintiff rated her pain at 8 out of 10. She reported continued pain in her right shoulder. (Ex. 40F: Tr. 1406, Filing 15-4 at 49.) Dr. Dubrow noted: "It appears to me that she has recurrent instability to her left shoulder which is chronic in nature and secondary to her diagnosis of Ehlers Danlos syndrome." Dr. Dubrow ordered an MRI of her left shoulder. (Ex. 40F: Tr. 1410, Filing 15-4 at 53.) On February 7, 2019, an MRI was performed of Plaintiff's left shoulder, which showed a likely anterior superior labral tear. (Ex. 33F: Tr. 1336, Filing 15-3 at 131.)

On May 30, 2019, Plaintiff returned to Dr. Dubrow concerning her shoulder pain. Dr. Dubrow noted: "Patient complains about pain all the time and unable to lay on either side at night due to the pain. The left shoulder is very unstable and states it pops out all the time." Celebrex and ice were not providing relief. (Ex. 40F: Tr. 1410, Filing 15-4 at 53.) Dr. Dubrow performed an exam and reviewed the recent MRI. He diagnosed "Bursitis/tendonitis, shoulder" and instability of left shoulder joint. It

was decided to continue with conservative treatment, and Dr. Dubrow recommended rotator cuff strengthening exercises. (Ex. 40F: Tr. 1414-15, Filing 15-4 at 57-58.)

Orthopedists

2016

On April 5, 2016, Plaintiff saw Casey Beran, M.D., at MCH & Health System, for review of her left hip and back pain. Plaintiff discussed her hypermobility in all her joints. Dr. Beran noted the x-rays had shown mild dysplasia of the left hip, diagnosed a likely labral tear from hip dysplasia, and ordered an MRI arthrogram. Dr. Beran noted that Plaintiff's range of motion in the spine does not cause any symptoms down the leg and that she had negative straight leg raises. Knees revealed tenderness to palpation, full range of motion and no skin abnormalities. Pelvis and hip x-rays showed mild dysplasia of the hip with no significant arthritic changes or spurring. (Ex. 6E: Tr. 447-48, Filing 16-7 at 153-54.) On April 8, 2016, the MRI was performed of Plaintiff's left hip. (Ex. 3F: Tr. 322-23, Filing 16-7 at 28-29.)

On April 19, 2016, Plaintiff returned to Dr. Beran, who reviewed the MRI and diagnosed degenerative tearing of the left acetabular labrum. Dr. Beran discussed avoidance of activities that would make her left hip pop or catch. (Ex. 6E: Tr. 445, Filing 16-7 at 151.)

On May 17, 2016, Dr. Beran performed a left hip cortisone injection. Plaintiff tolerated the procedure well and noted no problems with her gait. (Ex. 6F: Tr. 443-44, Filing 16-7 at 149-50.)

2018

On April 11, 2018, Plaintiff saw Dr. Darren Keiser, M.D., an orthopedist at Methodist Health System, concerning her bilateral shoulder pain. Plaintiff complained of stiffness, locking, catching, feelings of weakness and pain in her shoulders. On exam, Plaintiff had difficulty raising both shoulders above the 90-degree plane of elevation as well as other positive findings. Dr. Keiser obtained and reviewed x-rays of both shoulders, which showed well maintained bony intervals, a type 2 acromion, and some AC arthropathy, but no destructive or traumatic abnormality otherwise. Dr. Keiser planned to move forward with an MRI of Plaintiff's right shoulder and an x-ray of Plaintiff's left hip. (Ex. 20F: Tr. 560-63, Filing 14-1 at 102-05.)

On May 23, 2018, Plaintiff returned to Dr. Keiser who recommended surgical correction for her right shoulder issues. (Ex. 30F: Tr. 1184, Filing 15-2 at 84.)

On June 13, 2018, Plaintiff returned to Dr. Keiser's office following her recent right shoulder arthroscopy and right ring finger trigger release, and saw Ryan Houser, PA-C. Plaintiff reported she had quit taking pain medication due to side effects and had been a bit noncompliant with immobilizer because she found it uncomfortable. She was directed to return in four weeks for reevaluation. (Ex. 30F: Tr. 1153-54, Filing 15-2 at 53-54.)

On July 18, 2018, Plaintiff saw Sean C. Bigler, PA-C, for reevaluation. Plaintiff reported she was doing quite well overall, but explained she had some pain and had because of gastric problems had difficulty finding pain medicines that were agreeable with her. Mr. Bigler directed Plaintiff to discontinue use of her immobilizer and avoid any significant lifting, pushing, or pulling activity. (Ex. 30F: Tr. 1192-93, Filing 15-2 at 92-93.)

On August 8, 2018, Plaintiff saw Dr. Keiser. On exam, her right shoulder still had limited mobility and some irritability with motion arcs, mostly limited in abduction and external rotation. Dr. Keiser directed Plaintiff to avoid strenuous activity and any kind of lifting while moving forward with stretches as taught by the physical therapist and discussed the possibility of an eventual capsular release. (Ex. 30F: Tr. 1162, Filing 15-2 at 62.)

On September 5, 2018, Plaintiff returned to Dr. Keiser concerning her right shoulder. On exam, Plaintiff had end range tightness in all planes secondary to adhesive capsulitis. Dr. Keiser directed Plaintiff to continue with physical therapy and avoid strenuous activity such as significant lifting and to only lift what she was lifting with therapy. Dr. Keiser explained a capsular release was an option if she did not regain mobility. (Ex. 30F: Tr. 1175, Filing 15-2 at 75.)

On October 3, 2018, Plaintiff returned to Dr. Keiser. On exam, Plaintiff had end range tightness in all planes consistent with secondary adhesive capsulitis. It was decided to continue formal therapy and observation at that point instead of pursuing an arthroscopic capsular release. (Ex. 30F: Tr. 1138, Filing 15-2 at 38.)

On November 7, 2018, Plaintiff again saw Dr. Keiser concerning her right shoulder. Plaintiff felt it had improved, but her left shoulder was really bother her,

making her favor her right side and making her right side worse. Plaintiff also complained of about her hip issues. Dr. Keiser continued physical therapy for the right shoulder and planned an MRI for the left shoulder, with home exercises for both shoulders. Dr. Keiser planned to x-ray Plaintiff's left hip and pelvis on her return. (Ex. 30F: Tr. 1127-28, Filing 15-2 at 27-28.)

On December 31, 2018, Plaintiff returned to Dr. Keiser concerning her shoulders and hip issues. She reported as follows: "Her right shoulder is better than 80% compared to where she was before her shoulder surgery. She states she has a little bit of collarbone discomfort with certain movements, but her left shoulder is much worse than her right at this point. This is a shoulder that she can sublux and voluntarily dislocate. She has pain at night, pain with reaching and raising her arm." On exam, Dr. Keiser found: "Both shoulders were examined which have symmetric forward elevation, abduction, external rotation, internal rotation. She is able to demonstrate positive impingement findings on the left, positive bicipital findings on the left, fair strength with abduction, external/internal rotation compared to both shoulders. She is neurovascularly intact distally." Plaintiff stated she was content and satisfied with the right shoulder, but she agreed to a corticosteroid injection in the left shoulder. She decided to hold off on an MRI of the left shoulder. (Ex. 30F: Tr. 1116, Filing 15-2 at 16.)

### 2019

On February 7, 2019, a left hip intra-articular steroid injection for left hip pain. was performed by Dr. Beran at CHI Health. (Ex. 33F: Tr. 1337, Filing 15-3 at 132.)

On June 24, 2019, Plaintiff saw Paul Watson, M.D., at CHI Health, for evaluation of her hip pain. (Ex. 40F: Tr. 1416, Filing 15-4 at 59.) On exam, Dr. Watson noted "severe multidirectional instability" in her right shoulder, multidirectional instability in her left shoulder, hyperextension in both knees, and several findings in both hips. Dr. Watson noted x-rays showed left hip dysplasia, and Dr. Watson reviewed the April 2016 left hip MRI. Physical examination revealed intact sensation, 5/5 strength in the upper and lower extremities, negative lumbar straight leg raise, and full range of motion in the tested joints with some pain in the hip and knees. X-ray imaging of the hip revealed only mild hip dysplasia, but no fracture, dislocation, or loose fragments. Dr. Watson noted a left hip arthroscopy with acetabuloplasty and possible femoroplasty with an acetabular labral

debridement versus repair was indicated. Plaintiff elected to proceed with the procedure. (Ex. 40F: Tr. 1420-21, Filing 15-4 at 63-64.)

On August 1, 2019, Plaintiff saw orthopedic surgeon Matthew Dilisio, M.D., upon referral from Dr. Quinn, to discuss bilateral elbow pain. (Ex. 42F, Tr. 1433, Filing 15-4 at 76.) Examination of cervical spine revealed no tenderness, normal range of motion, no instability, intact muscle strength, and preserved sensation. Similarly examination of the elbows revealed no tenderness, appropriate range of motion, no instability, intact muscle strength, and preserved sensation. Regarding Plaintiff's complaints of shoulder pain, Dr. Dilisio stated: "I do not recommend any stabilization for her left shoulder as likely a result of her connective tissue disease and surgery is not improving [*sic*] to be too beneficial for that. I think doing reasonable from a right shoulder standpoint after her prior rotator cuff repair and she is not unstable." (Ex. 42F, Tr. 1438-39, Filing 15-4 at 81-82.)

### Rheumatologists

### 2017

On July 27, 2017, Plaintiff saw Deborah Doud, M.D., to evaluate her joint hypermobility and possible Ehlers-Danlos syndrome and chronic joint pain. (Ex. 4F: Tr. 335, Filing 16-7 at 41.) On exam, Plaintiff had hypermobility in joints and some hip instability, as well as typical trigger points consistent with fibromyalgia. Dr. Doud diagnosed Ehlers-Danlos Syndrome with a Beighton score of 10 out of 10 and fibromyalgia. Dr. Doud noted: "I also explained to her that there was no treatment for Ehlers-Danlos syndrome other than physical therapy to strengthen the muscles around the major joints to support the joints." Dr. Doud prescribed physical therapy and started gabapentin and trazodone. (Ex. 4F: Tr. 338, Filing 16-7 at 44.)

### 2018

On January 26, 2018, Plaintiff again saw Dr. Doud concerning her fibromyalgia and Ehlers-Danlos syndrome. She rated her pain at 6 out of 10. On exam, Plaintiff had hypermobility in her knees, elbows, shoulders and hips, and trigger points consistent with fibromyalgia. Dr. Doud noted Plaintiff never used the prescription for physical therapy that was written 6 months earlier. Dr. Doud started cyclobenzaprine and explained Plaintiff needed to get her major muscles stronger to support her hyper mobile joints. (Ex. 13F: Tr. 489-90, Filing 14-1 at 31-32.)

On March 20, 2018, Plaintiff complained about her increasing shoulder issues and rated her pain at 6 out of 10. She reported fatigue and fibro fog. On exam, Dr. Doud noted: "She has marked increase in range of motion of most major joints especially the shoulders elbows and knees. Her Beighton score [for joint laxity and hypermobility] is 10/10. There is no joint swelling or synovitis. She has trigger points consistent with fibromyalgia." Dr. Doud directed Plaintiff to continue aquatic therapy and keep her appointment with the orthopedist. (Ex. 13F: Tr. 491-92, Filing 14-1 at 33-34.)

On August 16, 2018, Plaintiff reported being in a lot of pain and a having a "frozen" right shoulder. Plaintiff reported her pain ranged from 7 to 10 out of 10 in her right shoulder and she had pain elsewhere as well. On exam, Plaintiff was not able to internally rotate her right shoulder and had abduction limited to about 30 degrees and flexion limited to 90 degrees. She had the trigger points consistent with fibromyalgia. Dr. Doud continued Celebrex and started Lyrica. For Ehlers-Danlos Syndrome, Dr. Doud recommended strengthening the muscles around her major joints to help with the joint laxity. (Ex. 21F: Tr. 566-67, Filing 14-1 at 108-09.)

### 2019

On July 30, 2019, Plaintiff saw Nada Skaf, M.D., upon referral from Dr. Quinn, for evaluation of her diffuse pain and Ehlers-Danlos syndrome. (Ex. 41F: Tr. 1423, Filing 15-4 at 66.) On exam, Plaintiff could dislocate the left shoulder posteriorly and she had hypermobility in her thumb and elbows. She could place her palms on the floor with her knees in full extension. She was wearing a right ankle brace. Dr. Skaf noted a clinical diagnosis of Ehlers Danlos syndrome, hypermobile type (type III), pending genetic evaluation. Dr. Skaf specifically noted strenuous physical activities should be avoided, and physical therapy should be considered to strengthen major muscle groups to decrease joint strain and braces may be used for support and/or comfort. Recommended activities included low impact exercises like yoga, swimming, walking, stretching, and water aerobics, which were also recommended for fibromyalgia. (Ex. 41F: Tr. 1427-28, Filing 15-4 at 70-71.)

### Other Treating Physicians

On November 8, 2017, Plaintiff saw Rebecca A. Ehlers, M.D., upon referral from Tabitha M. Nenninger, M.D., for her gastrointestinal complaints. At the visit,

musculoskeletal examination revealed normal gait and station. (Ex. 8F: Tr. 457, Filing 16-7 at 163.)

On October 1, 2018, Plaintiff saw her gynecologist, and reported that "she is not yet able to raise her right arm in all directions after the surgery." (Ex. 24F: Tr. 889, Filing 14-5 at 63.)

### Chiropractic Care

On January 3 and 17, 2018, Plaintiff sought chiropractic care for her various pain complaints, rating her pain at 5 out of 10. (Ex. 16F: Tr. 498, 500, Filing 14-1 at 40, 42.) On January 26, February 13, March 7 and 26, 2018, Plaintiff rated her pain at 4 out of 10. (Ex. 16F: Tr. 502, 504, 506, Filing 14-1 at 44, 46, 48.) On May 4 and 22, 2018, Plaintiff reported her lumbar pain was at 7 out of 10. (Ex. 23F: Tr. 864, 866, Filing 14-5 at 38, 40.) On January 10 and 28, and February 8 and 27, 2019, Plaintiff reported pain at 5 out of 10 in her thoracic and lumbar spine. (Ex. 32F: Tr. 862, 1306-10, Filing 14-5 at 36, 101-05.) From April 12, 2019, through the date of the hearing, Plaintiff consistently sought chiropractic treatment for her back/sacral/pelvis pain. (Ex. 32F: Tr. 1286-1302, Filing 15-3 at 83-97.)

### Physical Therapy

On February 2, 2018, Plaintiff started physical therapy that had been prescribed by Dr. Doud. (Ex. 19F: Tr. 515-20, Filing 14-1 at 57-62.) On April 25, 2018, Plaintiff reported that although her hips were sore, she was gardening and doing yoga. (Ex. 22F: Tr. 578, Filing 14-2 at 11.) Plaintiff regularly attended physical therapy through April 15, 2019. After her husband's heart attack, she cancelled remaining appointments to care for him and was formally discharged from physical therapy in July of 2019. (Ex. 33F: Tr. 1330-34, Filing 15-3 at 125-29.)

### Licensed Independent Clinical Social Workers

On October 27, 2017, Bruce Sather, Ph.D., LICSW, provided a summary of counseling treatment with Plaintiff. He saw Plaintiff approximately 18 times since August 2015, focusing primarily on PSTD and depression. Plaintiff discontinued therapy in 2016 to care for her grandchildren, but returned to therapy in March 2017 and had been consistent since then. (Ex. 7F: Tr. 452-53, Filing 16-7 at 158-59.)

On November 2, 2017, Plaintiff saw Ruth Sather, Ph.D., LICSW, for mental health therapy. (Ex. 25F: Tr. 933, Filing 14-5 at 107.) Plaintiff saw her on a fairly regular basis after that time. (Ex. 25F: Tr. 920-32, Filing 14-5 at 94-106; Ex. 39F: Tr. 1401-04, Filing 15-4 at 44-47.)

<u>Advanced Practice Registered Nurse</u>

On July 17, 2018, Plaintiff saw Anne Hofer, APRN, at CHI Health for an evaluation for psychiatric medication management. Plaintiff explained that Dr. Quinn had wanted her to see psychiatry for her psychiatric medications. Plaintiff requested treatment for her depression and PTSD. She reported a depressed mood, decreased appetite, negative side talk, and anxiety. Ms. Hofer diagnosed severe major depression without psychotic features and anxiety. Ms. Hofer continued nefazodone and Xanax. Concerning PTSD, Ms. Hofer noted: "The patient does describe some clinically significant posttraumatic stress symptoms related to several different incidences throughout her life." Ms. Hofer then noted several incidences and noted Plaintiff described various symptoms of PTSD. (Ex. 26F: Tr. 948-49, Filing 15-1 at 2-3.) Plaintiff reported fatigue, myalgias and arthralgias, and occasional migraine headaches. On physical examination, Plaintiff exhibited normal range of motion in the musculoskeletal system with a normal gait. Plaintiff was negative for any gait problems or joint swelling. Plaintiff's mental status examination revealed proper cooperation, good eye contact, normal speech, congruent affect, logical thought association, normal thought content, no hallucination, intact memory, steady gait and station, normal fund of knowledge, intact attention and concentration, and fair insight and judgment (Ex. 26F: Tr. 955-56, Filing 15-1 at 9-10.)

On August 28, 2018, Plaintiff reported she did not feel her medications had significantly impacted her mood. She was interested in retrying sertraline. Plaintiff complained of her fibromyalgia and shoulder pain and explained physical therapy was not going as well as she had hoped. She stated her frequent fibromyalgia exacerbations caused increased psychiatric symptoms. Plaintiff reported only getting about 2-3 hours of sleep each night. (Ex. 26F: Tr. 958, Filing 15-1 at 12.) Plaintiff showed normal muscle strength and tone, and a steady gait and station. Her psychological examination was also normal with a euthymic mood, mood-congruent affect, normal speech, normal thought process, logical thought association, normal

thought content, no hallucinations, intact memory, good concentration and attention, good insight and judgment, and proper orientation. Ms. Hofer tapered Plaintiff off nefazodone and started sertraline. (Ex. 26F: Tr. 963-64, Filing 15-1 at 17-18.)

On October 11, 2018, Plaintiff reported some decreased mood lability and depression and described insomnia that was chronic. She reported some increased panic attacks due to PTSD triggers. Plaintiff reported getting about 4-6 hours of sleep each night. Ms. Hofer continued sertraline at 100 mg daily. (Ex. 26F: Tr. 965-66, Filing 15-1 at 19-20.) Physical examination revealed normal gait, no need for assistive devices, and normal muscle tone and strength. Mental status examination was also normal (Ex. 26F: Tr. 969-70, Filing 15-1 at 23-24.)

On December 10, 2018, Plaintiff reported increased pain and bowel symptoms since her last appointment. (Tr. 971-72, Filing 15-1 at 25-26.) Ms. Hofer increased sertraline to 150 mg daily. (Tr. 977, Filing 15-1 at 31.)

On February 11, 2019, physical examination revealed steady gait, no need for assistive devices, and normal muscle tone and strength. Mental status examination was also normal with a euthymic mood, mood-congruent affect, normal speech, normal thought process, logical thought association, normal thought content, no hallucinations, intact memory, good concentration and attention, good insight and judgment, and proper orientation. Ms. Hofer continued current medications with sertraline at 150 mg daily and Xanax three times daily as needed. (Ex. 38F: Tr. 1384-85, Filing 15-4 at 27-28.)

On April 11, 2019, Plaintiff reported an increase in mood lability and feeling very irritable and agitated and having increased anxiety. Plaintiff reported difficulty sleeping at night due to anxiety. (Ex. 38F: Tr. 1386-87, Filing 15-4 at 29-30.) Physical examination again revealed steady gait, no need for assistive devices, and normal muscle tone and strength. Mental status examination was also normal with a euthymic mood, mood-congruent affect, normal speech, normal thought process, logical thought association, normal thought content, no hallucinations, intact memory, good concentration and attention, good insight and judgment, and proper orientation. Ms. Hofer increased sertraline to 200 mg daily and continued Xanax three times daily as needed. (Ex. 38F: Tr. 1389-91, Filing 15-4 at 32-34.)

On July 26, 2019, Plaintiff again saw Ms. Hofer for psychiatric medication management. Plaintiff had broken her ankle after stepping into a hole at her farm. Plaintiff reported delayed healing due to her Ehlers-Danlos Syndrome. Plaintiff reported some increased anxiety. (Ex. 38F: Tr. 1392-93, Filing 15-4 at 35-36.) Mental status examination showed an anxious mood, but a mood-congruent affect, normal speech, normal fund of knowledge, normal thought process and content, logical thought association, absent hallucination, intact memory, fair attention and concentration, proper orientation, and no homicidal or suicidal ideation. Ms. Hofer continued sertraline and Xanax and prescribed trazodone to help with sleep. (Ex. 38F: Tr. 1397-98, Filing 15-4 at 40-41.)

### E. Medical Opinions

<u>Consulting Physician Assistant</u>

On November 29, 2017, Plaintiff saw Amanda Millemon, PA, for a consultative examination. (Ex. 10F: Tr. 465, Filing 14-1 at 7.) A musculoskeletal exam revealed the following:

> [Plaintiff] has for the most part normal range of motion although with her Ehlers-Danlos syndrome she is a little hesitant to head herself with full range of motion due to concerns for dislocation. This is most notable with her left hip and right shoulder. Her left shoulder definitely has decreased range of motion with forward elevation. Because of this in both shoulders she is concerned about dislocation. She is able to do this motion although she is hesitant with it. Similar problems with her left hip, she has pain when she is moving her left hip but she does have okay range of motion, but there are some difficulty in moving this joint and discomfort as well. There is some pain with palpation in the left hip and the right shoulder, otherwise there is no significant pain to palpation. There is no sign of effusion in any joint. There is no swelling or effusion in any of the joints and she has full strength in all muscle groups in bilateral upper and lower extremities.

(Tr. 469, Filing 14-1 at 11.) Neurological results were as follows:

> Cranial nerves II through XII are intact. She has normal sensation to touch in upper and lower extremities. Reflexes are normal bilaterally. Sensation is intact bilaterally. Gait is normal. Negative straight leg raising test. No clonus.

16

(*Ibid*.) Plaintiff "was somewhat anxious during exam and tearful throughout discussion with her history involving her events with her posttraumatic stress event. She was cooperative with normal thought content." (*Ibid*.) Ms. Millemon opined:

> The claimant's disability regarding her medical diagnosis is stemmed mostly from her Ehlers-Danlos syndrome, which involves all her joints. She most notably has problems with her left hip and right shoulder. She is very hesitant to move her joints full range of motion due to concerns for dislocation especially in her bilateral shoulders. She does have some tenderness to palpation on exam in her shoulders and hip but she seems to get around pretty well today during our visit although she does seem quite anxious throughout the exam. I think with her history of dislocations and pain there would definitely be some restrictions involving work and her ability to perform job duties especially with lifting, bending, crawling, carrying objects, handling objects, climbing. She could do some sitting or standing, but not for long periods as I think she has pain when she sits for long periods of time.

(Ex. 10F: Tr. 440, Filing 14-1 at 12.)

<u>Consulting Psychologist</u>

On November 30, 2017, Plaintiff saw Dr. Jennifer Lindner, Ph.D., for a psychological consultative examination. (Ex. 9F: Tr. 460, Filing 14-1 at 2.) Plaintiff's current mental functioning was assessed as follows:

> [Plaintiff] was oriented to date, time, day, and person, but not to place. Her attitude was cooperative. She had difficulty with long-term memory, but had adequate short-term and immediate memory. She had adequate concentration, although processing skills were slowed. She did appear somewhat impulsive. She demonstrated concrete reasoning skills.

> Her mood appeared depressed and anxious. Affect was anxious. Speech was appropriate in articulation and tone. She did report hearing her name called and nobody being there, but did not report any other psychotic symptoms. She reported lack of energy and always feels fatigued. She has experienced an increase of appetite due to quitting smoking. She has difficulty sleeping due to discomfort and pain. She believes she sleeps 4 to 5 hours and tries to nap early down in the afternoon.

17

(Ex. 9F: Tr. 462, Filing 14-1 at 4.) Dr. Lindner's assessment of Plaintiff's current adaptive functioning was as follows:

> [Plaintiff] typically wakes up. She will do dishes at 5 in the morning, get her daughter ready for school, and takes her daughter to school. When she is home, she will feed the dogs and have the TV on, but is not watching it due to all the sexual harassment allegations. She will read. She has been helping her fiance's mother put up Christmas decorations…. She has been researching doctors and completing disability paperwork. She spends a lot of time in the kitchen, canning and preparing dinners.

> [Plaintiff] has adequate daily functioning. She has difficulty with social interactions due to PTSD, hypervigilance and anxiety. She has difficulty coping with stress. She gets overwhelmed frequently and tends to shutdown. She lacks coping skills. She has adequate concentration. She would be capable of understanding instructions, as well as carrying them out. She would struggle with interacting with coworkers and supervisors due to PTSD, anxiety, and some paranoid ideation. She would struggle with adjusting to changes in routine due to feeling overwhelmed frequently. She would be capable of managing her own funds.

(Ex. 9: Tr. 462-63, Filing 14-1 at 4-5.) Dr. Lindner diagnosed PTSD and major depressive disorder, recurrent, severe. Prognosis was guarded. (Ex. 9: Tr. 463, Filing 14-1 at 5.)

State Agency Medical Consultants

On February 9, 2018, state agency medical consultant Jerry Reed, M.D., reviewed Plaintiff's medical records and found she could perform a reduced range of light work. Dr. Reed opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; she could stand or sit for 6 hours in a normal 8-hour day; she could occasionally climb, balance, stoop, kneel, crouch, or crawl; and she should avoid concentrated exposures to extreme cold, vibrations, and hazards. The postural limitations were "[p]rimarily due to pain complaints," but Dr. Reed noted that the medical evidence "supports occasional postures as [Plaintiff] generally has normal strength, and normal [range of motion] in all joints." Dr. Reed also opined that Plaintiff's ability to push or pull with her upper extremities was limited, stating:

> Claimant may have difficulty with overhead reaching due to discomfort and anxiety about dislocation of joint. She does have excellent strength in UE, excellent grip strength, no muscle atrophy, and this would indicate her ability to perform at least light work activity without a lot of overhead reaching. She describes a pretty physical daily routine which involves gardening, cleaning her home, transporting her children to and from activities.

(Ex. 1A: Tr. 73-74, Filing 16-3 at 12-13.)

On May 7, 2018, another state agency medical consultant, Robert Roth, M.D., conducted his own independent review of the evidence and affirmed Dr. Reed's opinion (Ex. 3A: Tr. 93-95, Filing 16-3 at 32-95.) Dr. Roth noted that Dr. Reed had given Plaintiff "light RFC restrictions with careful attention given to her shoulders and to avoid bilateral overhead reaching," and he concluded that "[t]his continues to appear appropriate." (Ex. 3A: Tr. 90, Filing 16-3 at 29.)

### Anne Hofer, APRN

On July 26, 2019, Ms. Hofer completed a mental medical source statement form and provided her opinions concerning how Plaintiff's mental impairments limited her ability to work. Diagnoses included anxiety; depressive disorder, severe; insomnia; and PTSD. Plaintiff's prognosis was rated "fair." Ms. Hofer explained that Plaintiff "has a number of medical issues that, paired with her mental health issues, make it unlikely that she will be able to maintain gainful employment or return to maximum functional capacity." (Ex 36F: Tr. 1365, Filing 15-4 at 8.)

Ms. Hofer noted on a check-box form that Plaintiff had functional limitations in a number of categories. She was most limited in working at an appropriate and consistent pace, sustaining an ordinary routine and regular attendance at work, and working a full day without needing more than the allotted number or length of rest periods at a consistent pace. Ms. Hofer expected Plaintiff to be off task 10 percent of a workday and to be absent from work two days per month on average as a result of her impairments. (Ex 36F: Tr. 1366-67, Filing 15-4 at 9-10.)

## II. DISCUSSION

### A. Standard of Review

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). Under this standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a mere scintilla." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

The Court must also determine whether the Commissioner's decision is based on legal error. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating allegations of legal error are reviewed de novo).

### B. Plaintiff's Physical Limitations

"An ALJ determines a claimant's RFC 'based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Koch v. Kijakazi*, No. 19-3421,

___ F.4th ___, 2021 WL 2944242, at *9 (8th Cir. July 14, 2021) (quoting *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (alteration in original)). "[A] claimant's RFC is a medical question ...." *Id.* (quoting *Combs*, 878 F.3d at 646). "Therefore, the ALJ must use some medical evidence of the claimant's ability to function in the workplace in order to make a proper RFC assessment; the ALJ may not simply draw his own inferences about the claimant's functional ability from medical reports." *Id.* (internal quotations, alterations, and citations omitted). But "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007)).

The ALJ may rely on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work. *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *Combs*, 878 F.3d at 646. However, the opinions of non-treating, non-examining sources are not generally considered to be substantial evidence at step five. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.") (citation omitted); *see also Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir.2004) ("[T]he ALJ's duty to develop the record fully and fairly ... includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.").

Plaintiff contends the ALJ's "occasional overhead reaching" limitation lacks sufficient medical support. Plaintiff claims her ability to reach overhead is more limited, and she points to the following evidence.

> [Plaintiff] testified concerning overhead activities as follows: "I can raise my arms above my head, but I would not lift anything above my – like a gallon of milk I would not." (Tr. 50, Filing 16-2 at 51).[8] The record generally shows [Plaintiff] had issues with her shoulders

---

[8] Plaintiff also responded affirmatively when asked if she had problems lifting things in front of her: "Yes. I have trouble lifting no matter, you know, at what height or weight." (Tr. 50, Filing 16-2 at 51.)

dislocating that was observable on exam. (*See, e.g.*, Tr. 385, Filing 16-7 at 91) ("Does have dislocations to the left and right shoulders, passively.").[9] During the consultative examination [on November 29, 2017, Amanda Millemon. P.A.,] noted difficulty with full range of motion of [Plaintiff's] shoulders specifically due to concerns for dislocation. (Tr. 470, Filing 14-1 at 12). The record shows [Plaintiff] generally had difficulty with raising her arms above her head. (*See, e.gs.*, Tr. 1116, Filing 15-2 at 16; 1184, Filing 15-2 at 84).[10]

After a record review, the agency medical consultants found [Plaintiff] could not perform overhead reaching at the level the ALJ found in the RFC. (*See* Tr. 74, 76, Filing 16-3 at 13, 15; Tr. 90, 93-94, Filing 16-3 at 29, 32-33). Specifically, the reconsideration explanation explains: "She does have issues with both shoulders and *avoiding heavy lifting and overhead reaching appears appropriate.* RFC affirmed." (Tr. 90, Filing 16-3 at 29) (emphasis added). The ALJ purportedly found these agency medical consultant opinions persuasive. (Tr. 19, Filing 16-2 at 20). The hearing decision contains no explanation for why the agency medical consultant opinions that [Plaintiff] could not perform overhead reaching activities were not followed. (*See id.*).

(Filing 21 at 23-24.)

The ALJ did not specifically discuss Plaintiff's testimony that she would not lift a gallon of milk above her head, but he did reference Plaintiff's reported daily activities (Exhibit 8E: Tr. 237-41, Filing 16-6 at 45-49), which he generally found to be inconsistent with Plaintiff's alleged loss of functioning:

The claimant … has reported experiencing joint pain, weakness, anxiety, and racing thoughts, all of which allegedly limit her ability to perform activities. She has reported that she is unable to stay in one position for long periods, lift, dig, or carry more than a gallon of milk

---

[9] This is a notation made by Plaintiff's primary care physician, Dr. Amber Beckenhauer, D.O., in connection with an annual exam on May 17, 2017.

[10] The first record is a notation made by Dr. Keiser on December 31, 2018, when Plaintiff reported having pain with reaching and raising her left arm and received a corticosteroid injection in the left shoulder. (Tr. 1116, Filing 15-2 at 16.) The second record is an earlier notation made by Dr. Keiser on May 23, 2018, when he recommended surgery for Plaintiff's right shoulder. (Tr. 1184, Filing 15-2 at 84)

(Exhibit 8E). She alleged that she sometimes needs assistance getting out of the bathtub, getting up from a seated position, and gaining her balance before walking (Exhibit 8E)….

The claimant has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. The claimant admits the ability to perform personal care tasks independently, such as bathing, dressing, personal hygiene, feeding, and toileting (Exhibit 8E). She admits the ability to cook meals, shop, and drive (Exhibit 8E). In terms of household tasks, she is able to do the dishes, do laundry, feed pets, collect eggs, and take her daughter to school and karate (Exhibit 8E). She also reports gardening, fishing, reading, and watching television regularly (Exhibit 8E).

While the claimant's ability to engage in these ordinary life activities is not itself conclusive proof that she is also able to engage in substantial gainful activity, her capacity to perform these tasks independently is a strong indication that she retains the capacity to perform the requisite physical and mental tasks that are part of everyday basic work activity. That indication is further supported by the objective medical signs and findings discussed in more detail below. All of these factors, considered together, constitute sufficient evidence of the claimant's ability to engage in full-time, competitive work within the parameters of the above residual functional capacity.

(Tr. 16, Filing 16-2 at 17.)

The ALJ summarized medical records concerning Plaintiff's shoulder issues and other physical limitations, which included the May 2017 annual exam by Dr. Beckenhauer in Exhibit 5F, the November 2017 consultative examination by Ms. Millemon in Exhibit 10F, and the 2018 visits to Dr. Keiser in Exhibit 30F:

In March 2016, just prior to the claimant's alleged onset date, she reported that she was experiencing ongoing fatigue and chronic left hip pain; despite this, she was able to be active and farm (Exhibit 5F). In April of that year, she reported that pain in her hip and lumbar spine had caused her to stop working as a massage therapist (Exhibit 5F). An MRI of the left hip revealed an attenuation that was suggestive of degenerative tearing, but was otherwise normal (Exhibit 3F/17-18). The following month, she reported that she had episodes in which she had to lift her leg manually to move it because of pain (Exhibit 5F). By July 2016, she reported that her left hip pain had completely resolved after

receiving an injection; this resolution continued into February 2017, though she did report an overall increase in joint pain at that time (Exhibit 5F).

In May 2017, the claimant reported that her bilateral shoulders were dislocating with little or no effort; while she had pain on the right, her left shoulder was pain free (Exhibit 5F). In July 2017, she was seen for a follow-up visit. It was thought that Ehler-Danlos syndrome was a possible diagnosis, but she had not had testing done, and the claimant reported ongoing dislocations and subluxations in the joints, as well as morning stiffness (Exhibit 4F). Ehler-Danlos syndrome was subsequently confirmed by testing. Also in July, the claimant had imaging of the shoulders that was normal (Exhibit 5F/70). At a November 2017 consultative examination, she again reported ongoing pain in her left hip and right shoulder (Exhibit 10F).

In January 2018, the claimant received chiropractic care for her low back pain; this continued through 2018 and 2019 (Exhibits 16F; 23F). She had a rheumatology evaluation for fibromyalgia in January 2018, as well, at which time she reported experiencing morning stiffness most of the day (Exhibit 13F). She was referred to physical therapy and was told that she needed to strengthen her muscles in order to support her joints (Exhibit 13F). She began physical therapy in February 2018 for her joint pain and laxity; at her first visit, she reported that she had decreased strength and energy, which limited her ability to garden and care for animals (Exhibit 19F). Later that month, she reported that her pain was stable, though the elbow sleeves she was using were tight (Exhibit 19F).

In March 2018, the claimant reported experiencing increased soreness after moving boxes (Exhibit 19F). At a follow-up visit for Ehlers-Danlos, she reported that she was experiencing fatigue, fibromyalgia fog, and morning stiffness lasting most of the day (Exhibit 13F). She then reported increased soreness at physical therapy with increased activity and more driving (Exhibit 19F). By the following month, she reported experiencing stiffness, weakness, pain, and locking in her joints; she was noted to have failed conservative treatment and had to change her hairstyle because fixing her hair was too painful (Exhibit 20F). Despite this, she was able to begin tending her garden and doing yoga (Exhibit 22F). In May 2018, she reported increased tightness in her legs after gardening (Exhibit 22F). The claimant underwent surgery

24

in the right shoulder; eight days after this, she reported frustration with how her shoulder felt, but had been noncompliant with her immobilizer (Exhibit 30F). In June 2018, she reported increased pain in the right shoulder; this continued in July and August of that year (Exhibits 21F; 22F; 27F; 30F).

By September 2018, however, the claimant reported some improvement, though she reported increased soreness after cutting and coloring her hair (Exhibit 22F). In October 2018, she denied being able to move her right arm in all directions but reported that her shoulders were "fine" by mid-month (Exhibit 22F). In late October, she reported increased pain, indicating that she may have pushed it with chores around the house and carving pumpkins (Exhibit 22F). By November, she was continuing physical therapy but only reporting intermittent discomfort in the right shoulder (Exhibit 30F). She reported satisfaction with her range of motion, but wanted to increase her strength, so physical therapy continued (Exhibit 22F). In December 2018, she reported that her right shoulder was 80% improved from where it was pre-surgery, though she reported pain in her left shoulder (Exhibit 30F).

In January 2019, she was still reporting left shoulder pain, particularly with external rotation (Exhibit 40F); an MRI of the left shoulder revealed mild bursitis and osteoarthritis with a probable anterior superior labral tear (Exhibit 33F/24). Imaging of the bilateral hips that month was normal (Exhibit 31F/31). In April of that year, she reported that she could not sleep on her shoulders because of this pain (Exhibit 33F). However, that same month, she was able to be active in her garden and complete her activities of daily living without increased pain; she was also able to stand for a prolonged period at band practice (Exhibit 33F). She fell and fractured her right ankle, following which she began wearing an ankle brace-despite this injury, she reported the ability to walk a lot while caring for her ten acres (Exhibit 35F). In July 2019, she again reported an inability to sleep on her shoulders, as they would dislocate if she did (Exhibit 41F).

(Tr. 16-18, Filing 16-2 at 17-19.)

Finally, the ALJ stated that he was relying on the opinions of the state agency medical consultants in assessing Plaintiff's physical RFC:

The state agency consultants reviewed the claim at the initial and reconsideration levels of adjudication; their opinions are persuasive

(Exhibits 1A; 3A). Physically, they determined that the claimant retained the ability to perform a reduced range of light work. As discussed above, the claimant has retained a normal gait and full strength, and has endorsed the ability to perform activities that demonstrate the ability to perform exertional work consistent with light work. The limitation to a reduced range of light work is, therefore, supported by the overall evidence and consistent with the objective findings and the claimant's own alleged activities.

(Tr. 19, Filing 16-2 at 20.)

Contrary to Plaintiff's argument, the state agency medical consultants did not find that Plaintiff was unable perform overhead reaching activities. Rather, they determined that while Plaintiff "may have difficulty with overhead reaching due to discomfort and anxiety about dislocation of joint," she could perform "at least light work activity without a lot of overhead reaching." This medical opinion is entirely consistent with the ALJ's determination that Plaintiff could perform light work with occasional overhead reaching.

Nor is there any obvious inconsistency between the ALJ's "occasional lifting" restriction and the assessment of Plaintiff's physical limitations that was provided by the physician assistant who examined her on December 4, 2017. Ms. Millemon thought that with Plaintiff's "history of dislocations and pain there would definitely be some restrictions involving work and her ability to perform job duties especially with lifting, bending, crawling, carrying objects, handling objects, climbing." (Tr. 470, Filing 14-1 at 12.) As the ALJ recognized, Ms. Millemon "determined that there would be some limitations in the claimant's ability to function, but did not specify what these limitations would be." (Tr. 19, Filing 16-2 at 20.)

Plaintiff contends the ALJ was required to develop the record because there is no clear opinion from an examining medical source regarding the extent of her physical limitations. "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); *Perks*, 687 F.3d at 1092-93 (8th Cir. 2012) (same)). "In the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Id.* (quoting *Johnson*

26

*v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)). There need not be "medical evidence that precisely supports each component of the RFC," and a claimant's RFC cannot be proven "*only* with medical evidence." *Peterson v. Colvin,* Case No. 13-00329-CV-W-ODS, 2013 WL 6237868, at *4 (W.D.Mo. Dec. 3, 2013) (emphasis in original) (citing *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000)); *Dykes v. Apfel,* 223 F.3d 865, 866 (8th Cir. 2000)).

Here, as the ALJ noted, the objective medical evidence showed many normal examination findings, including normal muscle strength and tone in the upper and lower extremities, intact sensation, normal reflexes, appropriate gait without the need of any assistive devices, and negative straight leg raising. (Tr. 443, 448, 457, Filing 16-7; Tr. 481, 485, Filing 14-1; Tr. 955, 963, 969, Filing 15-1; Tr. 1210, 1277, Filing 15-3; Tr. 1384, 1390, 1420, 1433-39, Filing 15-4.) The record also shows that Plaintiff's complaints of shoulder pain were mostly resolved with treatment. For example, in August 2018, Plaintiff admitted to improvement in her range of motion with aquatic therapy and that she could almost get her right hand behind her head. (Tr. 667, Filing 14-3.) In December 2018, Plaintiff admitted that her right shoulder was 80% better after she had undergone a rotator cuff repair. (Tr. 1116, Filing 15-2.) When Plaintiff saw her orthopedic surgeon in August 2019 for complaints of bilateral shoulder and elbow pain, Dr. Dilisio did not recommend any surgery or stabilization techniques for either her right or left upper extremities. (Tr. 1439, Filing 15-4.) Rather, his physical examination revealed 5/5 of strength, normal range of motion in the cervical spine, elbows, and hands with intact sensation and no evidence of weakness or atrophy. (Tr. 1438-39, Filing 15-4.) The ALJ's discussion of this evidence was as follows:

> The objective findings in this case are not consistent with the claimant's alleged loss of functioning. Physically, she exhibits some abnormalities, including hypermobility and dislocations of the shoulders (Exhibits 4F; 5F; 13F), tenderness in the hips and low back (Exhibits 4F; 5F; 10F), decreased range of motion in the hips and shoulders (Exhibits 4F; 5F; 6F; 10F; 12F; 21F), and trigger points consistent with fibromyalgia (Exhibits 4F; 13F; 21F)…. However, despite these abnormalities, findings are frequently normal. The claimant typically exhibits full strength, a normal gait, normal range of motion, and no acute distress (Exhibits 1F; 3F-6F; 8F; 10F-13F; 21F; 24F; 31F; 35F; 38F; 40F; 41F)….

27

The medical evidence establishes the claimant has the above medically determinable impairments; however, the claimant has failed to prove disability based on these conditions. The evidentiary discrepancies identified throughout this decision cast serious doubt upon the consistency of the claimant's allegations of disability. In addition to the normal objective findings noted above, the claimant has admitted to a wide range of activities, including frequent gardening and performing, which can require abilities greater than the above residual functional capacity. These consistency factors render the claimant's allegations, including subjective reports to health care providers and hearing testimony, less persuasive than the objective medical evidence. Those objective findings—viewed alongside the reported activities of daily living—support the claimant's ability to engage in basic work activity consistent with the above residual functional capacity.

(Tr. 18-19, Filing 16-2 at 19-20.)

"The ALJ is required to recontact a treating or consulting physician or order further testing only if the medical records presented do not provide sufficient evidence to make a decision on disability." *Higgins v. Comm'r of Soc. Sec. Administration*, No. 420CV01043LPRJTK, 2021 WL 3014138, at *3 (E.D. Ark. July 15, 2021) (citing *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011)). That is not the situation presented here.

Plaintiff compares her case to *Sedlak v. Saul*, No. 8:18CV515, 2019 WL 3766377 (D. Neb. Aug. 8, 2019), but the ALJ in *Sedlak* failed to explain why he rejected a treating neurologist's opinion that the claimant was limited to "occasional use of his upper extremities for handling, reaching, or fingering," and instead made a determination that the claimant could perform "frequent but not constant handling, fingering, and feeling bilaterally." *Id.*, at *9. The case was not remanded for development of the record, but, rather, "for analysis of Sedlak's ability to perform 'frequent' handling, fingering, and feeling, including citation to, and discussion of, supporting medical evidence." *Id.*, at *12 (D. Neb. Aug. 8, 2019).

If a comparison is to be made, then Plaintiff's case more closely resembles *Barrows v. Colvin*, No. C 13-4087-MWB, 2015 WL 1510159 (N.D. Iowa Mar. 31, 2015), in which Judge Mark W. Bennett held that the ALJ did not err "in relying on the opinions of non-treating, non-examining sources [to find that the claimant had the physical RFC to perform light work] because the ALJ considered those opinions

along with other medical evidence of record." *Id.*, at *18. Thus, the ALJ's decision was affirmed "even though the record [did] not include an explicit opinion by a treating or examining source as to Barrows's physical work-related limitations based on his impairments." *Id.*, at *1.

Plaintiff also argues that even if she had the residual functional capacity to perform occasional overhead reaching, there is not sufficient proof that the three representative jobs cited by the vocational expert ("VE") can be performed with only occasional overhead reaching. There is no merit to this argument. The VE testified that while an individual with Plaintiff's RFC would be unable to perform her former positions of home health aide or massage therapist because "[t]hey would exceed the of lifting tolerances of this hypothetical," such an individual could work, for example, as an inserting machine operator, subassembler for electrical equipment, or marker. (Tr. 58-59, Filing 16-2 at 59-60.) The ALJ specifically asked the VE if her testimony was consistent with the Dictionary of Occupational Titles, and the VE responded:

> Nothing stated was inconsistent with that manual. However, it does not specifically specify the direction of reach such as in overhead reaching, whether or not it's done with one arm or both. My response regarding that issue is based on my 30 plus years rehab experience.

(Tr. 59-60, Filing 16-2 at 60-61.)

Vocational experts are professionals under contract with SSA to provide impartial testimony in agency proceedings. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). They must have "expertise" and "current knowledge" of "[w]orking conditions and physical demands of various" jobs; "[k]nowledge of the existence and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs." *Id.* (quoting SSA, Hearings, Appeals, and Litigation Law Manual I-2-1-31.B.1. (Aug. 29, 2014)). When offering testimony, vocational experts may invoke not only publicly available sources but also "information obtained directly from employers" and data otherwise developed from their own "experience in job placement or career counseling." *Id.*, at 1152-53 (2019) (quoting Social Security Ruling, SSR 00-4p, 65 Fed. Reg. 75760 (2000)). Here, the VE was well-qualified, *see* Exhibit 16E (Tr. 287, Filing 16-6 at 95), and her testimony is uncontradicted.

## C. Plaintiff's Mental Limitations

The ALJ noted Plaintiff "reported that she has anxiety attacks and flashbacks that make her feel like she is having a heart attack; these can occur daily and last 30-60 minutes (Exhibit 8E). Following these attacks, she alleged that she is exhausted and emotionally unstable (Exhibit 8E)." (Tr. 16, Filing 16-2 at 17.) In finding that Plaintiff could perform a range of light work with no more than occasional contact with the public and coworkers and no more than occasional changes in the work setting, the ALJ first discussed the applicable medical records and concluded that the objective findings were not consistent with Plaintiff's alleged loss of functioning. The ALJ stated:

> With regard to the claimant's mental impairments, her treatment has been limited. In April 2016, she reported wanting to see someone for possible PTSD, but did not want to take medication (Exhibit 5F). By February 2017, she reported that medication was helping her symptoms "tremendously" (Exhibit 5F/26). She attended therapy focused on PTSD triggers, and her provider indicated in October 2017 that she had been seen consistently for seven months (Exhibit 7F). In November 2017, she was sent for a consultative examination; at that time, she reported paranoia, tearfulness, hopelessness, and helplessness (Exhibit 9F). She was noted to have adequate daily functioning, but endorsed difficulty with social interaction and coping skills (Exhibit 9F). Throughout 2018 and 2019, the claimant received therapy for her impairments (Exhibits 12F; 25F); in July 2018, she reported that was still experiencing symptoms that negatively affected her personal life, work, and relationships (Exhibit 26F). By October 2018, she reported improvement in her mood, as well as less tearfulness (Exhibits 25F; 26F). While she reported increased depression in December 2018, she reported an even mood in February 2019 (Exhibits 26F; 38F). In April 2019, she reported increased anxiety and difficulty sleeping; in July 2019, she was experiencing more stress, but was generally doing well (Exhibit 38F).

> The objective findings in this case are not consistent with the claimant's alleged loss of functioning…. Mentally, she exhibits some tearfulness (Exhibits 1F; 10F; 28F), anxious and depressed mood (Exhibits 5F; 9F; 10F; 26F; 28F), flat affect (Exhibit 5F), tangential thought process

(Exhibits 5F; 26F), but fair insight and judgment (Exhibit 26F). However, despite these abnormalities, findings are frequently normal.... She is … generally observed to have a normal mood and affect, normal insight and judgment, normal behavior, adequate hygiene, a cooperative and friendly demeanor, adequate memory and concentration, and good eye contact (Exhibits 3F; 5F; 8F-12F; 20F; 24F; 26F; 31F; 35F; 37F; 38F; 40F; 41F).

(Tr. 18, Filing 16-2 at 19.)

The ALJ again found the opinions of the state agency consultants persuasive. In addition, he relied on the opinion of the consulting psychologist, Dr. Lindner, who examined Plaintiff on November 30, 2017. The ALJ stated:

Mentally, the state agency determined that the claimant would be limited in her ability to interact with others and adapt to changes. As discussed above, the claimant has endorsed paranoia and reports isolating and being easily overwhelmed, which would cause difficulty functioning in these areas, while she has generally exhibited normal mental functioning and would largely be able to perform mental activities in a work environment. Thus, the state agency opinion is both consistent with and supported by the substantial evidence of record.

Jennifer Lindner, PhD, performed the psychological consultative examination and determined that the claimant would have some difficulty with social interaction and coping with changes (Exhibit 9F). As with the state agency opinions, this is persuasive. Dr. Lindner's opinion is supported by her own narrative report regarding the claimant's mental functioning, and is consistent with the other objective findings and the claimant's own allegations, as discussed above.

(Tr. 19, Filing 16-2 at 20.)

However, the ALJ dismissed the opinion of Anne Hofer, APRN, who managed Plaintiff's psychiatric medication. On July 26, 2019, Ms. Hofer completed a medical source statement form, consisting mostly of check-box responses, in which she noted that while Plaintiff had a 0-5% impairment in most areas of mental

functioning, she would have a 15% impairment in her ability to (1) work at an appropriate and consistent pace, (2) sustain an ordinary routine and regular attendance at work, and (3) work a full day without an unreasonable number of breaks. (Tr. 1365-69, Filing 15-4 at 8-10.) Ms. Hofer's explanations for these 15% limitations were, respectively: (1) "Due to patient's physical limitations it would not be reasonable to expect her to work at a consistent pace"; (2) "Would likely have difficulty with performance/attendence [*sic*] d/t mental/physical issues"; and (3) "Would likely be unable to work without accommodation d/t mental/physical issues." (Tr. 1367, Filing 15-4 at 11.) Ms. Hofer also stated that Plaintiff "has a number of medical issues that, paired with her mental issues, make it unlikely that will be able to return to maintain gainful employment or return to maximum functional capacity." (Tr. 1365, Filing 15-4 at 8.)

The ALJ's reasons for refusing to accept Ms. Hofer's opinion were stated to be as follows:

> One of the claimant's providers, Anne Hofer, APRN, completed a medical source statement indicating significant limitations (Exhibit 36F). Ms. Hofer indicated that the claimant would be unable to function in a number of areas up to 15% of an 8-hour workday; this form is not persuasive. Ms. Hofer's limitations are not supported by the treatment records, and are inconsistent with the objective findings. Moreover, Ms. Hofer's form indicates greater limitations than expected given the claimant's own admitted activities, as discussed above.

(Tr. 20, Filing 16-2 at 21.)

Because Plaintiff filed her application after March 27, 2017, the new regulations pertaining to the evaluation of medical opinions apply. Under these new regulations, the Commissioner chose not to retain the "treating source rule" that could require deference to treating source opinion evidence. 82 Fed. Reg. at 5853. As the agency explained, since adoption of the "treating source rule" in 1991, healthcare delivery has changed in significant ways, and the agency's adjudicative experience has shown that the source of an opinion is no longer the most important factor for determining the persuasiveness of the opinion. *Id.* In evaluating claims filed March 27, 2017, or later, the agency "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a) (2017). Rather, the ALJ focuses on the persuasiveness of the medical opinion or prior administrative medical finding using these five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(a)-(c) (2017). The new regulations also no longer specify that adjudicators must "give good reasons" for the weight given a treating source opinion. Compare 20 C.F.R. §§ 404.1527(c)(2) (2016) and 20 C.F.R. §§ 404.1527(c)(2) (2017) with 20 C.F.R. § 404.1520c(b) (2017).[11]

Supportability[12] and consistency[13] are the two most important factors in determining the persuasiveness of a medical source's medical opinion or a prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2) (2017). While the ALJ must explain in his decision how persuasive he finds a medical opinion based on supportability and consistency, the ALJ is not required to explain how he considered the remaining factors in the decision. *Id.*; 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2017). Here, the ALJ stated he did not find Ms. Hofer's opinion

---

[11] As the agency explained: "Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standards of review, which is intended to be highly deferential standard to us." 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017); *see* 81 Fed. Reg. 62560-01, 62,572 (Sept. 9, 2016).

[12] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2017).

[13] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(1) (2017).

persuasive because it was not supported by treatment records and was inconsistent with the objective findings and Plaintiff's daily activities. (Tr. 20, Filing 16-2 at 21.)

Plaintiff contends this is not a sufficient explanation of the "supportability" and "consistency" factors under the Eighth Circuit's decision in *Lucus v. Saul*, 960 F.3d 1066 (8th Cir. 2020), involving a case where an ALJ discredited the opinion of the DIB applicant's treating physician with a blanket statement that the opinion was "internally inconsistent and contradicted by the record and her own treatment notes." *Id.*, at 1067 (8th Cir. 2020).[14] The ALJ did not provide examples from the record or state with any specificity why she found the record inconsistent, and the court was unable to find any inconsistency between the physician's opinion and the treating notes that were discussed by the ALJ. The *Lucus* panel thus held that the ALJ's failure to adequately explain her reasoning according to the then-existing social security regulations constituted legal error. *Id.* at 1068-70.

Here, as in *Lucus*, the ALJ stated a conclusion that Ms. Hofer's opinion was unpersuasive based on inconsistency. (Tr. 20, Filing 16-2 at 21.) However, unlike *Lucus*, the ALJ's decision contains an earlier discussion of evidence which supports his reasoning that Ms. Hofer's opinion was inconsistent with the objective findings and Plaintiff's daily activities. (Tr. 18, Filing 16-2 at 19.) *See Thomas v. Kijakazi*, No. 4:20 CV 363 DDN, 2021 WL 3566621, at *7 (E.D. Mo. Aug. 12, 2021) (ALJ's boilerplate conclusion that treating physician's opinion was "far too restrictive" was distinguishable from *Lucus* because ALJ had previously discussed inconsistent evidence); *Synder v. Saul*, No. 19-CV-134-LRR, 2021 WL 537207, at *10 (N.D. Iowa Jan. 27, 2021) (ALJ's statement that psychiatrist's opinion "does not appear to be generally consistent with the record as a whole, or with [his] own treatment notes" was sufficient where ALJ had cited those notes throughout his opinion), *report and*

---

[14] "*Lucus* was a case under the old regulations, which required ALJs to provide 'good reasons' when they declined to give a controlling physician's opinion. 960 F.3d at 1068. While the Eighth Circuit has not had the occasion to interpret the articulation requirements under the new rule, the district courts that have considered the issue have applied *Lucas* [*sic*] and similar precedent." *Thomas v. Kijakazi*, No. 4:20 CV 363 DDN, 2021 WL 3566621, at *7 n. 6 (E.D. Mo. Aug. 12, 2021) (citing cases).

*recommendation adopted sub nom. Snyder v. Comm'r of Soc. Sec.*, 2021 WL 521308 (N.D. Iowa Feb. 11, 2021). Likewise, the ALJ's finding that Ms. Hofer's mental RFC opinion was "not supported by the treatment records" was also adequate, given his discussion of Ms. Hofer's treatment notes (Exhibit 38) in the decision. (Tr. 18-19, Filing 16-2 at 19-20.) *See Thomas*, 2021 WL 3566621, at *7 ("Unlike the inconsistency finding in *Lucus*, a finding that the [treating physician's] opinion is unsupported speaks to the absence of evidence…. Evidence did not exist to support [the] opinion, thus the ALJ's rationale and her conclusion that the opinion was unpersuasive and lacking in substantial support is adequate. Accordingly, the ALJ did not require the Court to 'fill in the gaps' of her thinking.") (quoting *Lucus*, 960 F3d at 1069).

In *Lucus*, "the ALJ did not make her reasoning 'sufficiently specific to make [it] clear to any subsequent reviewers." 960 F.3d at 1069 (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). In this case, though, the ALJ has explained his reasons for rejecting Ms. Hofer's opinion with sufficient specificity. Accordingly, the court finds no legal error.

### D. Plaintiff's Credibility

When evaluating a claimant's credibility as to subjective complaints, the ALJ must consider the *Polaski* factors. *Grindley v. Kijakazi*, No. 20-1946, __ F.4th __, 2021 WL 3556102, at *4 (8th Cir. Aug. 12, 2021) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). Those factors include: "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Id.* (quoting *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010)). "Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Id.* (quoting *Halverson*, 600 F.3d at 931-32). The ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Halverson*, 600 F.3d at 932 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009))

Plaintiff argues that "ALJs must acknowledge the *Polaski* factors by listing them," and that "[t]he ALJ did not do that in this case." (Filing 28 at 5.) The cases cited by Plaintiff do not support this proposition, and, to this court's knowledge, the Eighth Circuit has not imposed such a requirement. Indeed, in *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Court of Appeals found no reversible error where "[a]lthough the ALJ did not explicitly cite *Polaski,* he clearly considered the following factors: [claimant's] daily activities, the effectiveness of his medication and other treatments, his work history, and the absence of objective medical evidence to support his complaints." *Id.*, at 558. The Eighth Circuit also held in a case decided under the old regulations that it is sufficient for an ALJ to cite and conduct an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, "which largely mirror the *Polaski* factors." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007); *see Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) ("An ALJ need not expressly cite the *Polaski* factors when, as here, the judge conducts an analysis pursuant to 20 C.F.R. § 416.929 …."); *Novotny v. Saul*, No. 8:18-CV-437, 2019 WL 4942257, at *10 (D. Neb. Oct. 8, 2019) ("If an ALJ conducts his analysis under 20 C.F.R. §§ 404.1529, he need not expressly cite the *Polaski* factors because the regulations mirror those factors."). This is what the ALJ did in this case. *See* Tr. 15, Filing 16-2 at 16 ("In making this [RFC] finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.").[15]

---

[15] Social Security Ruling 16-3p applies to final decisions of the Commissioner made on or after March 28, 2016. The ruling eliminates the use of the term "credibility" when evaluating a claimant's subjective statements of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished). The factors to be considered in evaluating a claimant's statements, however, remain the same. *See id*. at *13 ("Our regulations on evaluating symptoms are unchanged."). "If there is no information in the evidence of record regarding one of the factors [the agency adjudicators] will not discuss that specific factor in the determination or decision because it is not relevant to the case. [They] will discuss the factors pertinent to the evidence of record." *Id*. at *8.

Importantly, the ALJ articulated the inconsistencies upon which he relied in discrediting Plaintiff's subjective complaints, finding that Plaintiff "has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations" (Tr. 16, Filing 16-2 at 17); that her treatment for mental impairments "has been limited" (Tr. 18, Filing 16-2 at 19); and that the "objective findings in this case are not consistent with the claimant's alleged loss of functioning" (*ibid*.). In particular, the ALJ stated that, physically, Plaintiff "typically exhibits full strength, a normal gait, normal range of motion, and no acute distress" (*ibid*.) and, mentally, that she "is generally observed to have a normal mood and affect, normal insight and judgment, normal behavior, adequate hygiene, a cooperative and friendly demeanor, adequate memory and concentration, and good eye contact" (*ibid*.). As set out above, the ALJ also detailed Plaintiff's daily activities and reviewed in chronological order the course of treatment for her physical and mental impairments, which overall showed improvement with surgery, medication, and therapy. There is substantial evidence to support the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

The fact that the ALJ did not cite *Polaski* or list each of its factors does not require a reversal. *See, e.g., Calvert v. Colvin*, No. 4:15CV00215 JLH, 2016 WL 3024077, at *1 (E.D. Ark. May 25, 2016) ("The administrative law judge did not cite *Polaski*, but he did cite the regulations that parallel *Polaski*.... Although the administrative law judge did not include in his opinion a separate section devoted specifically to these factors, it is clear from the opinion as a whole that the administrative law judge considered the relevant factors and discussed them in detail during the course of the opinion. Furthermore, the record as a whole supports the administrative law judge's conclusion that the severity of symptoms and limitations alleged by Calvert are not consistent with the objective medical evidence.").

An ALJ's credibility finding will be upheld so long as it is adequately explained and supported. *Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006). The court finds on the evidence presented that the ALJ did not err in his credibility evaluation and assessment of the severity of Plaintiff's subjective complaints and limitations.

# III. CONCLUSION

Substantial medical evidence supports the ALJ's determination that Plaintiff is limited to "occasional overhead reaching," and the ALJ was not required to develop the record in order to make a physical RFC determination. The ALJ's reliance upon the VE's opinion in determining Plaintiff was not disabled because of the overhead reaching limitation was also appropriate. In making the mental RFC determination, the ALJ did not err in rejecting the opinion of the advanced practice registered nurse. The ALJ sufficiently explained that the nurse's opinion was inconsistent with the objective findings and Plaintiff's daily activities, and was unsupported by her treatment records. Finally, the ALJ properly analyzed and discounted Plaintiff's subjective complaints under applicable regulations and caselaw. Accordingly, the Commissioner's decision will be affirmed.

IT IS THEREFORE ORDERED:

1. Filing 20, Plaintiff's motion for an order reversing the Commissioner's decision, is denied.
2. Filing 22, Defendant's motion for an order affirming the Commissioner's decision, is granted.
3. Judgment shall be entered by separate document.

Dated this 25th day of August 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge